IN RE the MARRIAGE OF:

Karmin M. MARITATO, Petitioner-Respondent,

v.

Mario B. MARITATO, Respondent-Appellant.

Court of Appeals

*No. 03–2074. Submitted on briefs April 8, 2004.—Decided
June 2, 2004.*

2004 WI App 138

(Also reported in 685 N.W.2d 379.)

On behalf of the respondent-appellant, the cause was submitted on the brief of *Thomas W. Anderson, Jr.*, of *Anderson & Anderson*, of Kenosha.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Thomas W. St. John*, and *Jennifer I. Bolger*, of *Friebert, Finerty & St. John*, of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. NETTESHEIM, J. Mario B. Maritato appeals from the child support and property division provisions of a judgment of divorce. The judgment orders Mario to pay child support to his former wife, Karmin M. Maritato, in the amount of $1583.36 per month, based on his placement time with their two children of 43% under the shared-time payer guidelines. Mario contends that the trial court erred in failing to find an equal placement arrangement based on overnight equivalent care. We disagree and affirm this portion of the judgment. Alternatively, Mario argues that the trial court erred in failing to deviate from the child support percentage guidelines on the basis of unfairness. We reverse and remand this portion of the judgment because the trial court failed to address this argument on the merits. Mario additionally contends that the trial court erred in the valuation and division of Karmin's stock options and in the inclusion of the parties' 2001 income tax refund in the marital estate. We reject these arguments and affirm this portion of the judgment.

## BACKGROUND

¶ 2. On April 4, 2001, Karmin petitioned for a divorce from Mario. The parties married in June 1990 and had been married just under eleven years at the commencement of the action. The parties have two minor children who were ages eight and six at the time of the divorce.

¶ 3. During the pendency of the divorce, the parties entered into a stipulation as to the legal custody and physical placement of their minor children. The stipulation, which was approved by the court and granted as a partial judgment on January 3, 2002, provides:

> [T]he respondent [Mario] shall have placement of the children on Tuesdays and Wednesdays including overnights, returning the children to the child care provider on Thursday mornings, and on alternating weekends from Friday until Sunday at 7:30 p.m. The petitioner [Karmin] shall have placement of the children at all other times and hours.

The parties' shared placement arrangement resulted in Mario having placement with the children 43% of the time and Karmin having placement with the children 57% of the time.

¶ 4. On May 13, 2002, the trial court entered a temporary order requiring Mario to pay child support in the amount of $1821 per month based on the shared placement formula and the parties' respective incomes. The order followed a motion hearing at which Mario requested that his Sunday placement constituted an overnight for purposes of calculating percentage placement. The trial court temporarily denied Mario's request but reserved the issue for trial.

¶ 5. The matter proceeded to trial on January 16, 2003. Although the parties had entered into written and oral stipulations regarding certain marital assets prior to trial, issues remained regarding the division of Karmin's stock options, distribution of the parties' 2001 tax refund and the determination of child support. Both Karmin and Mario testified as to these

257

issues at trial. In addition, Mario presented the testimony of an accountant on the issues of child support and the tax refund.

¶ 6.　On May 8, 2003, the trial court entered its written judgment of divorce, findings of fact and conclusions of law. With respect to Karmin's stock options, the trial court declined to include Karmin's unvested stock options in the marital estate but did include a portion of her vested options with an assigned value of $1440. Contrary to Mario's request, the trial court divided the parties' 2001 income tax refund equally. With respect to child support, the trial court denied Mario's request to find his Sunday placement equivalent to overnight care and additionally denied his request to deviate from the child support guidelines.

¶ 7.　Mario appeals the trial court rulings.

## DISCUSSION

¶ 8.　The division of marital property and the calculation of child support are matters generally left to the sound discretion of the trial court. *Cook v. Cook*, 208 Wis. 2d 166, 171, 560 N.W.2d 246 (1997). The discretionary decision of the trial court is not erroneous if the decision reflects "a reasoning process dependent on facts in, or reasonable inferences from, the record and a conclusion based on proper legal standards." *Abitz v. Abitz*, 155 Wis. 2d 161, 174, 455 N.W.2d 609 (1990) (citation omitted).

### 1. Child Support

¶ 9.　Mario contends that the trial court erred in denying his request to find his Sunday placement to be the equivalent of overnight care pursuant to Wis.

Admin. Code § DWD 40.02(25) (2003)[1] or, in the alternative, failing to deviate from the application of the shared-time payer formula set forth in the child support guidelines on grounds of unfairness.

¶ 10. Mario's first argument is based on a Note to the WIS. ADMIN. CODE § DWD 40.02(25). Section DWD 40.02(25) defines a shared-time payer as follows:

> **(25)** "Shared-time payer" means a payer who provides overnight child care or equivalent care beyond the threshold and assumes all variable child care costs in proportion to the number of days he or she cares for the child under the shared-time arrangement.

The Note to § DWD 40.02(25) provides:

> Note: There are physical placement arrangements in which the payer provides child care beyond the threshold and incurs additional cost in proportion to the time he or she provides care, but because of the physical placement arrangement he or she does not provide overnight care (e.g., payer provides day care while the payee is working). Upon request of one of the parties the court may determine that the physical placement arrangement other than overnight care is the equivalent of overnight care.

Mario contends that if his Sunday placement until 7:30 p.m. had been considered equivalent to overnight care,

---

[1] We observe that WIS. ADMIN. CODE § DWD 40.02(25) (2003) has been revised and renumbered, effective January 1, 2004. The current definition for "shared-time payer" is in § DWD 40.02(26), and has been renamed "shared-placement payer;" the definition itself has been changed and, most significantly, the note to § DWD 40.02(25) has been completely eliminated.

All references to WIS. ADMIN. CODE § DWD 40.02(25) are to the 2003 version.

his child support would have been based on an equal allocation of placement.[2]

■

¶ 11. Mario argued to the trial court that the time he spends with the children on Sunday until 7:30 p.m., including providing them with dinner, is equivalent care. The trial court disagreed, finding that Karmin had duties and care of the children after they were returned on Sunday evenings[3] and that Mario's care on Sunday evening did not rise to the level of overnight equivalent care. The court stated:

> The fact the respondent may have provided another meal between noon and when he returned the children is not the equivalent of the "overnight" concept employed by the department to set the percentage standard formula. If the department wanted to determine the percentage standard based on the number of hours in a 24–hour period a person has a child, it could have done so. As the department's note to subsection 25 demonstrates, the "equivalent care" concept must be something of substance.

¶ 12. Mario contends that the Note to Wis. Admin. Code § DWD 40.02(25) does not indicate that the placement must be something of substance, as the trial court had found. However, the example of equivalent care

---

[2] Karmin disputes this assertion on grounds that she cares for the children occasionally during Mario's placement periods when he is on vacation or unable to care for the children for other reasons. Karmin asserts that even considering Mario's Sunday to be equivalent care, she would still have placement with the children 57% of the time because of these schedule adjustments. The trial court did not reach this issue based on its finding that Mario's Sunday placement did not constitute equivalent care.

[3] Karmin testified that she then generally provides them with additional food and has them brush their teeth before bed.

260

recited in the Note is, in fact, one in which a parent, not otherwise receiving credit, is providing a substantial amount of additional care.[4] Here, when Mario has a Saturday overnight, he spends Sunday with the parties' two children, provides them with dinner and returns them to Karmin at 7:30 p.m. We agree with the trial court that there is nothing about Mario's Sunday placement that would make it substantially different than any other day of placement following an overnight for which the parent has already been credited.

¶ 13. We conclude that the trial court properly exercised its discretion in denying Mario's request to consider his Sunday placement equivalent to overnight care.

¶ 14. That brings us to Mario's second argument. Mario requested the trial court to deviate from the shared-time formula under the percentage guidelines on grounds of fairness. The court declined.

¶ 15. WISCONSIN STAT. § 767.25(1j) provides that in an action for divorce, a trial court "shall determine child support payments by using the percentage standard established by the department under [WIS. STAT. §] 49.22(9)" except as provided under subsec. (1m). Section 767.25(1m) provides:

> Upon request by a party, the court may modify the amount of child support payments determined under sub. (1j) if, after considering the following factors, the court finds by the greater weight of the credible evidence that use of the percentage standard is unfair to the child or to any of the parties:

---

[4] We note that the use of the words "day care" suggests that the department envisioned a situation in which the nonplacement parent provides care, or the financial cost of such care, for the children while the placement parent is at work.

(a) The financial resources of the child.

(b) The financial resources of both parents.

(bj) Maintenance received by either party.

(bp) The needs of each party in order to support himself or herself at a level equal to or greater than that established under 42 U.S.C. § 9902(2).

(bz) The needs of any person, other than the child, whom either party is legally obligated to support.

(c) If the parties were married, the standard of living the child would have enjoyed had the marriage not ended in annulment, divorce or legal separation.

(d) The desirability that the custodian remain in the home as a full-time parent.

(e) The cost of day care if the custodian works outside the home, or the value of custodial services performed by the custodian if the custodian remains in the home.

(ej) The award of substantial periods of physical placement to both parents.

(em) Extraordinary travel expenses incurred in exercising the right to periods of physical placement under s. 767.24.

(f) The physical, mental and emotional health needs of the child, including any costs for health insurance as provided for under sub. (4m).

(g) The child's educational needs.

(h) The tax consequences to each party.

(hm) The best interests of the child.

262

(hs) The earning capacity of each parent, based on each parent's education, training and work experience and the availability of work in or near the parent's community.

(i) Any other factors which the court in each case determines are relevant.

In challenging the application of the child support standards, the burden falls on Mario to establish that application of the standards would be unfair. *See Raz v. Brown*, 213 Wis. 2d 296, 304, 570 N.W.2d 605 (Ct. App. 1997).

¶ 16. The trial court rejected Mario's "fairness" argument in a footnote, stating:

Although [Mario] cites sec. 767.25(1m), Stats., for this proposition, he does not do an analysis based on the factors to be considered under that section and therefore neither will this court. [Mario] simply claims the percentage standard is unfair based on the fact the party's disposable net income is different. The sole fact the parties may have different disposable incomes in and of itself does not make the application of the percentage standard unfair to one of the parties. *Luciani v. Montemurro-Luciani*, 199 Wis. 2d 280, [544 N.W.2d 561] (1996).

██

¶ 17. We agree with the trial court that a disparity in disposable incomes does not in and of itself make the application of the percentage standards unfair to one of the parties. *See id.* at 305–06. However, under the facts of this case, we conclude that this principle of law did not excuse the trial court from conducting an analysis of the relevant statutory factors set out in Wis. Stat. § 767.25(1m).

¶ 18. Moreover, we disagree with the trial court's statement that Mario's "fairness" argument was limited

solely to an alleged disparity in the parties' postsupport disposable incomes. To the contrary, Mario further argued that the needs of the children did not warrant the level of support produced by application of the guidelines. As such, Mario additionally argued that the support award, in part, constituted disguised maintenance.

¶ 19. In *Luciani*, the supreme court instructed:

> When presented with a party's challenge to application of the percentage standards, circuit court judges in exercising their discretion, are to consider the statutory factors set forth by the legislature in WIS. STAT. § 767.25(1m), and articulate the basis for their decision to either remain within the guidelines or allow a modification. The circuit court's articulation of its reasoning process is essential in reaching a reasonable determination and to aid this court in reviewing the discretionary decision.

*Luciani*, 199 Wis. 2d at 295. In a footnote to the above quote, the supreme court criticized the court of appeals for implying in an earlier case that such an analysis is not necessary where the trial court chose to not deviate from the guidelines. *Id.* at n.11.

¶ 20. In the instant case, Mario presented a challenge to the application of the percentage standards on fairness grounds and presented a developed argument based on certain of the evidence in support of that challenge. Under *Luciani*, we conclude that the trial court was required to perform the analysis of the relevant statutory factors in answer to that challenge. We reverse this portion of the judgment and remand for further consideration of the issue.[5]

264

## 2. *Property Division*

### *Stock Options*

¶ 21. On three separate occasions during the marriage, Karmin received stock options from her employer, Abbot Laboratories. At the time of trial, some of these stock options were vested while others remained unvested. The trial court declined to divide the entire unvested portion of the stock options and divided only a portion of the vested options. Mario argues that the trial court should have divided all the stock options.

██

¶ 22. A stock option is the ability to buy stock at a future date at a specific value, usually the value on the date of granting the option. Gregg Herman, *Stock Options In Divorce,* 19 Wis. J. Fam. L. 61, 61 (1999). Generally, stock options are given to key employees to motivate them to remain as employees and to increase efficiency and performance. *Chen v. Chen,* 142 Wis. 2d 7, 12, 416 N.W.2d 661 (Ct. App. 1987). A stock option contract, like an unvested pension, is not a mere gratuity, but an enforceable contract right. *Id.* It is an economic resource, comparable to pensions and other employee benefits, and thus a form of property. *Id.*

---

[5] Our reversal and remand on this issue in no way implies that the trial court must accept Mario's argument. A trial court is not mandated to deviate from the percentage guidelines, but may do so if it finds that the great weight of the credible evidence demonstrates that the application of the guidelines would be unfair. *See* Wis. Stat. § 767.25(1m). Instead, we simply require the trial court to address Mario's fairness argument on the merits.

Our holding also dispenses with the need for us to address Mario's related argument that the support order, in part, constitutes disguised maintenance since that argument is a subset of Mario's fairness challenge to the application of the guidelines.

¶ 23. We begin by observing that the issue in this case is not whether certain portions of Karmin's stock options were included or excluded from the marital estate—an issue which would present a question of law. *See id.* at 12. The trial court's written decision correctly recognized under *Chen* that both vested and unvested stock options are properly included a marital estate. Like the trial court, we quote from *Chen*:

> Generally, all of the parties' property at the date of divorce, except that derived through gift or inheritance, is subject to division. Whether the asset is characterized as vested, unvested, or a future interest is a factor to be considered in the property division. The mere fact that the interest in the asset is contingent does not mean that it may be ignored.

> The trial court properly included the stock options, both accrued and non-accrued, in the marital estate. Although certain stock options are not exercisable until after the time of the divorce, they are nonetheless an economic resource acquired during the marriage . . . . A stock option contract, like an unvested pension, is not a mere gratuity, but an enforceable contract right. It is an economic resource, comparable to pensions and other employee benefits, and thus a form of property. Although Steve's stock options are unassignable and unsalable, these are factors that relate to the issues of valuation and division.

*Id.*[6] (citations omitted).

---

[6] WISCONSIN STAT. § 767.255, which sets out the factors bearing on a property division, is to the same effect. Section 767.255(3)(j) instructs the trial court to consider "[o]ther economic circumstances of each party, including pension benefits vested or unvested, and future interests."

██

¶ 24. Instead, the question in this case deals with the trial court's ruling that even though Karmin's stock options were included in the marital estate, only those portions that carried a current value were subject to property division. The division of a marital estate, as opposed to the composition of the marital estate, is addressed to the trial court's discretion. *Id.* at 14.

¶ 25. Having identified the proper issue and the proper standard of review, we now turn to the specifics of Karmin's stock options. The following is a listing of the dates Karmin received her stock options, the number of shares awarded, the exercise prices of the options, the deadline for exercising the opinions, and the vested and unvested status of those options as of the date of trial, January 16, 2003:

1. March 1999—600 shares with an exercise price of $47.50 per share to be exercised by March 31, 2009; all shares vested at the time of trial;

2. February 2000—400 shares with an exercise price of $34.70 per share to be exercised by February 11, 2010; 267 shares initially vested; remaining shares scheduled to vest in February 2003.

3. February 2001—3500 shares with an exercise price of $48.36 per share to be exercised by February 9, 2011; 1167 shares initially vested; another 1167 options scheduled to vest in February 2003; remaining shares scheduled to vest in February 2004.

¶ 26. In its property division ruling, the trial court first determined that the unvested portion of Karmin's February 2001 stock options would not be divided. In support, the court noted that while these

options represented an "economic resource" under *Chen*, they had been awarded to Karmin just two months prior to the commencement of the action and that the parties had offered no evidence as to the present value, if any, of these options.

¶ 27. The trial court next determined that vested portions of the March 1999 and February 2001 stock options would not be divided because the exercise prices ($47.50 and $48.36 per share respectively) exceeded the current market value of the stock ($39.20), and therefore had no present value.

¶ 28. Finally, the trial court did divide the February 2000 options since the exercise price ($34.70 per share) was less than the market price of the stock ($39.20), but the court limited the present value to the difference between the two values ($4.50 per share).[7] After taking a 20% tax consideration into account, the court assigned a net value of $1440 to these vested options.

¶ 29. Generally, marital assets are valued as of the date of divorce. *See Wikel v. Wikel*, 168 Wis. 2d 278, 286, 483 N.W.2d 292 (Ct. App. 1992). Here, as noted, neither party presented evidence as to the present value, if any, of the stock options as of the time of trial.[8] However, it

---

[7] Although a portion of Karmin's February 2000 stock options were not vested as of the time of trial, these options had vested by the time of the trial court's written decision. The court therefore treated all of these stock options as vested.

[8] We make no determination whether stock options can be presently valued. In *Chen v. Chen*, 142 Wis. 2d 7, 11, 416 N.W.2d 661 (Ct. App. 1987), the court of appeals observed that certain of the expert testimony opined that it was impossible to determine the present value of stock options. In addition, the

is undisputed that as of the time of trial, January 16, 2003, the market price of Abbot Laboratories stock was $39.20 per share.

¶ 30. Relying on *Chen*, Mario argues that the trial court should have included all of Karmin's stock options in the marital estate. There, Steve Chen's stock options were acquired during the marriage, but were not exercisable until after the divorce. *Chen*, 142 Wis. 2d at 11. The trial court included the options in the marital estate, requiring Steve to pay his former wife one-half of the net profit resulting from any future exercise of the options.[9] *Id*. at 10–11. Noting the trial court's "broad discretion in the division of the marital estate," *id*. at 14, the court of appeals upheld the trial court's ruling. However, the court also added a note of caution:

> 'The formula for division derives from the facts of the individual case.' In an exercise of discretion, a trial court may reasonably reach a conclusion another judge may not reach. When the trial court has made no factual error, has applied the proper law, and has reached a reasoned decision, we sustain its discretionary determination.

*Id*. (citations omitted).

¶ 31. Later, in *Wikel*, the court of appeals upheld the exclusion of the stock options that were not exerciseable as of the time of trial. *Wikel*, 168 Wis. 2d at 285–87. Finding no legal or factual error, the court

court noted that the trial court had rejected other expert testimony opining as to the present value. *Id*.

[9] The *Chen* court further held that this method of division was proper under the third method approved in *Bloomer v. Bloomer*, 84 Wis. 2d 124, 135, 267 N.W.2d 235 (1978). *Chen*, 142 Wis. 2d at 15.

upheld the trial court's discretionary ruling. *Id.* However, *Wikel* did not cite to, or address, *Chen*.

¶ 32. We find no conflict between *Chen* and *Wikel*. We take note that both cases rest on the discretion afforded to a trial court in the matter of property division generally, and stock options in particular. *Chen*, 142 Wis. 2d at 14; *Wikel*, 168 Wis. 2d at 286. We also find it telling that *Chen* recognized that its holding did not establish a bright line rule: "While critics may claim this results in inconsistency, we believe the strength of the judicial system is enhanced when the judiciary possesses the ability in family law cases to tailor a remedy to fit the circumstances of the individual litigants before the court." *Chen*, 142 Wis. 2d at 18 (citation omitted).

¶ 33. Moreover, in his commentary on "Stock Options In Divorce," Attorney Gregg Herman has noted that the two cases can be read "as harmonious if one keeps in mind the general rule that property accumulated after the divorce is not divisible." Herman, *supra* at 66. Attorney Herman observes:

> Thus, in *Wikel*, if the option vests after the divorce, the "value" which is appreciation of the stock is "earned" after the divorce and is thus not divisible . . . . Thus, if the trial court found that the option was close to vesting and the employee spouse was likely to continue working . . . until the vesting was complete, it would not be a misuse of discretion to include the option in the marital estate. On the other hand, if, as in *Wikel*, there was a lengthy time before vesting, it would make more sense to exclude the option as property since it would be primarily "earned" postdivorce.

Herman, *supra* at 66.

¶ 34. We acknowledge that the scheduled vesting of the unvested portion of Karmin's stock options was

not in the distant future at the time of trial—a factor that might augur for including those options in the marital estate. But Mario does not cite to any evidence bearing on the other considerations—particularly whether Karmin's employment at Abbott Laboratories would endure until the unvested options become vested or until the 2009, 2010 and 2011 deadlines for exercising the options. Instead, Mario argued that all of Karmin's stock options should be divided as a matter of law under *Chen*. However, as we have already noted, *Chen* itself observed that its holding was not absolute for all cases.

¶ 35. We further hold that the trial court did not misuse its discretion by declining to divide those vested stock options that had an exercise price in excess of the current market value of the stock. As such, these "underwater" options had no present value, but rather only potential value that might be earned in the future, depending on market conditions. Attorney Herman's commentary agrees: "If the exercise price is less than the market value, of course it has no value." Herman, *supra* at 66.

¶ 36. Finally, we hold that the trial court did not misuse its discretion in valuing the vested portion of Karmin's 2000 stock options at the difference between the market value of the stock and the exercise value. Again, we cite to Attorney Herman's commentary with approval:

> If the stock is publicly traded and the option is fully vested, the value is the difference between the market value and the exercise value, reduced for taxes and any costs associated with exercising the option.

Herman, *supra* at 66.

¶ 37. We will sustain a trial court's exercise of discretion if the court has examined the relevant facts, applied the proper standard of law, and engaged in a rational decision-making process. *Schultz v. Darlington Mut. Ins. Co.*, 181 Wis. 2d 646, 656, 511 N.W.2d 879 (1994). The trial court's decision regarding the vested and unvested portions of Karmin's stock options complies with this test. We uphold the court's discretionary ruling.

## 2001 Tax Refund

¶ 38. Mario contends that the trial court erred in denying his request for an unequal distribution of the parties' 2001 tax refund in the amount of $20,192. The trial court divided the refund equally stating:

> [Mario] asks for an unequal distribution of the parties' 2001 income tax refund in trust. The basis of this argument is that the refund was due primarily to [Mario's] overpayment of estimated taxes and that this occurred during the time the parties were separated. The court rejects this argument for an unequal division. The income being earned by the respondent was not an individual asset of his alone. His income, like that of [Karmin's], was marital income to which each was equally entitled to.

¶ 39. A joint tax refund is a marital asset subject to division. *See, e.g., Forester v. Forester*, 174 Wis. 2d 78, 94–95, 496 N.W.2d 771 (Ct. App. 1993); *LaRocque v. LaRocque*, 139 Wis. 2d 23, 29, 406 N.W.2d 736 (1987). Mario argues that the division should be unequal because he withheld $60,683 in estimated taxes while

Karmin withheld $37,188. However, $9180 of the approximate $20,000 difference in withholdings was carried over from the parties' 2000 tax refund. Given that the refund was the product of both parties' significant earnings that were not markedly disparate,[10] and given that both parties made significant contributions to the refund, we uphold the court's determination that the parties should share the refund equally. We uphold the trial court's discretionary ruling.[11]

## CONCLUSION

¶ 40. We conclude that the trial court did not erroneously exercise its discretion in rejecting Mario's request that his Sunday placement constitutes over-

[10] The record reflects that Mario's adjusted gross income in 2001 was approximately $133,000 while Karmin's was approximately $101,000.

[11] Mario also argues that since the temporary order allowed him to use his income for living purposes, the trial court should have awarded the bulk of the refund to him. We do not find it remarkable that the parties funded their living expenses from their earnings. Most parties to a divorce action would do so without a temporary order to that effect. The existence of such an order does not alter the basic fact that the parties' tax refund existed as an asset to be divided. Nor does the order bear on the question of how the refund should be divided.

We also reject Mario's attempt to liken this case to *Long v. Long*, 196 Wis. 2d 691, 697, 539 N.W.2d 462 (Ct. App. 1995), in which the trial court included bonus income earned by the husband in the marital estate when that income had not been converted to tangible assets or other property. Contrary to Mario's suggestion that the money in *Long* remained in the husband's checking account, the facts of that case reflect that the income had been used by the husband to pay attorney fees and living expenses and was not used to acquire any tangible assets. *Id.* at 696. Thus, unlike the Maritatos' 2001 tax refund held in trust, there was no asset in *Long* to be divided.

night equivalent care. However, we conclude that the trial court erred by failing to fully address Mario's "fairness" argument against application of the guidelines on the merits. We reverse this portion of the judgment and remand for further proceedings on this issue. Finally, we conclude that the trial court properly exercised its discretion when dividing Karmin's stock options and the parties' 2001 tax refund.

¶ 41. No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.