In re the MARRIAGE OF: Tracy J. McReath,
Petitioner-Respondent,

v.

Timothy J. McReath,
Respondent-Appellant-Petitioner.

Supreme Court

*No. 2009AP639. Oral argument April 13, 2011.
—Decided July 12, 2011.*

2011 WI 66

(Also reported in 800 N.W.2d 399.)

644

647

For the respondent-appellant-petitioner there were briefs by *Andrew W. Erlandson* and *Hurley, Burish & Stanton, S.C.*, Madison, and oral argument by *Andrew W. Erlandson*.

For the petitioner-respondent there was a brief by *Richard J. Auerbach* and *Auerbach & Porter, S.C.*, Madison, and oral argument by *Richard J. Auerbach*.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a published opinion of the court of appeals[1] affirming the circuit court's order[2] that Timothy McReath (Tim) pay Tracy McReath (Tracy) $796,720 to equalize the property division upon the couple's divorce, as well as $16,000 per month for 20 years in maintenance. The questions presented are: (1) whether the entire value of the salable professional goodwill[3] of Tim's interest in Orthodontic Specialists, S.C. can be

---

[1] *McReath v. McReath*, 2010 WI App 101, 329 Wis. 2d 155, 789 N.W.2d 89.

[2] The Honorable James Evenson of Sauk County presided.

[3] Professional goodwill is the goodwill that is attendant to a professional business. *See infra* ¶ 28. As discussed below, for the purpose of property division, some courts and scholars

counted as divisible property in a marital estate, and (2) if the answer to the first question is yes, did the circuit court double count the value of the professional goodwill in Orthodontic Specialists when it based Tracy's maintenance award on Tim's expected future earnings from Orthodontic Specialists.

¶ 2. We conclude the entire value of the salable professional goodwill was properly counted as divisible property in the marital estate. Moreover, we conclude that the circuit court did not double count the professional goodwill from Orthodontic Specialists in the maintenance award. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

### A. Facts

¶ 3. This case requires us to review the circuit court's order dividing marital property and awarding maintenance in a divorce proceeding.[4] Tracy and Tim were married on August 27, 1988. Three children, all of whom were minors at the time the divorce proceedings were initiated, were born of their marriage.[5]

¶ 4. In 1991, Tim received his dental degree, and in 1993, he received a master's degree in orthodontia.

---

[4] The majority of the facts set out below are taken from the thorough factual findings set forth by the circuit court. When we derive facts from elsewhere in the record, we so note.

[5] The McReaths' eldest child has since reached the age of majority.

650

Accordingly, most of Tim's dental education was pursued during the marriage. Tim took out student loans to fund his education, all of which were repaid with marital funds.

¶ 5. Upon receiving his masters in orthodontia, Tim worked as an associate at Orthodontic Specialists for two years. Tim then purchased the Baraboo and Portage locations of Orthodontic Specialists from Dr. Grady.

¶ 6. Tim paid approximately $930,000 for the two locations of Orthodontic Specialists. A portion of this purchase price was attributed to a noncompete agreement that Dr. Grady signed and to transitional services that Dr. Grady provided Tim. Specifically, Tim testified that $100,000 was for the physical assets, corporate name, and corporate goodwill. The remaining $830,000 was for, as Tim described, "Dr. Grady's name, the noncompete clause, and the employment agreement that Dr. Grady would stay on to introduce me to his existing patients, [and] to counsel me through the process of learning how to do business."

¶ 7. With regard to the noncompete agreement, Tim testified that he would not have purchased Orthodontic Specialists for as high of a price as he did without a noncompete agreement because, "[Dr. Grady] could have just opened up a business just down the street and I'm assuming that he would have taken not only the majority of patients with him but the majority of the future patients in the area." Tim also testified that he was not aware of any transaction in the field of orthodontics, for any substantial value, that took place without a noncompete agreement. According to Tim, "the name of the practitioner is always weighted very heavily as opposed to the goodwill or the value of the name of the practice or corporation."

¶ 8. Tim has worked as the sole owner of Orthodontic Specialists since he purchased it from Dr. Grady. Tim has historically averaged a 60–hour work week. This is significantly more than the average orthodontist who works only 35 hours per week. Recently, Tim has reduced the number of hours he works to approximately 45 hours per week. Tim has no plans to sell or dispose of his practice.

¶ 9. Tim has been very successful in operating Orthodontic Specialists. His annual gross business revenues in the five years leading up to the divorce ranged from $1.6 million to in excess of $1.8 million. In the same five years, Tim received an average yearly net cash flow from Orthodontic Specialists of $697,522.[6] Notably, Orthodontic Specialists maintains the only orthodontic offices in Baraboo and Portage.

¶ 10. The success of Orthodontic Specialists has resulted in a relatively high standard of living for the McReath family. They have significant assets and little, if any, personal debt.

¶ 11. Unlike Tim, Tracy does not have a professional degree. She is a high school graduate with some college credits, but no college degree. Tracy worked outside the home while Tim was attending dental school. Throughout much of their marriage, however, Tracy worked as a homemaker and the primary caretaker for the couple's children. Specifically, she was

---

[6] The circuit court found the income calculations conducted by Tracy's expert to be correct, and rejected those conducted by Tim's expert. The circuit court's finding that Tim's expert had made an incorrect income valuation was based on the fact that Tim's expert limited his calculations to one year, 2007, which happened to be the worst financial year for Tim in the preceding five years. On appeal, Tim does not challenge the income calculations adopted by the circuit court.

completely out of the workforce from 1993 to 2000. From 2000 to 2008, she performed some financial and clerical duties for Orthodontic Specialists. In this position, she was paid $15,000 to $16,000 per year. The circuit court found Tracy has a current earning capacity of $14.50 per hour, or $30,160 annually.

## B. Procedural History

¶ 12. On May 16, 2007, Tracy filed a petition for divorce in Sauk County Circuit Court. Upon entering the order of divorce, the circuit court, among other things, divided the marital property and awarded maintenance to Tracy.[7]

¶ 13. Regarding the marital property division, with the exception of the value of Orthodontic Specialists, the parties stipulated to the value of their marital assets. They also stipulated to a division of assets with a balancing payment. Hearings were held on the appropriate fair market valuation of Orthodontic Specialists, and resulted in a valuation of $1,058,000. This was the value given by Tracy's expert, Craig Billings (Billings). The court rejected the $415,000 valuation of Tim's expert, Dennis Ksicinski (Ksicinski).[8]

---

[7] The parties entered into a stipulated agreement regarding the custody and physical placement of their three children.

[8] In accepting Billings' valuation, the court highlighted that Billings had "provided a comprehensive and thorough evaluation" of the business and "[h]is conclusions were supported by direct work with the practice including a site visit or visits, conversations with [Tim, a] review of the financial records" and "external information sources unique to the profession such as surveys and professional journal data."

The court found Ksicinski's valuation problematic because, among other things, Ksicinski relied significantly on informa-

¶ 14. Having valued Orthodontic Specialists at $1,058,000, the court turned to dividing the assets. The court found that there was no reason to deviate from the presumption of equal property division in Wis. Stat. § 767.61(3) (2009–10).[9] It then combined the $1,058,000 valuation of Orthodontic Specialists with the other, stipulated to, assets in the marital estate. Because, among other assets, Tim was the stipulated owner of Orthodontic Specialists, Tim's total assets exceeded Tracy's by $1,593,440. As such, to equalize the property division, the court awarded Tracy $796,720, to be paid at the rate of no less than $80,000 per year plus accrued interest.

¶ 15. Next, to set maintenance, the court used Tim's average annual earnings from Orthodontic Specialists over the preceding five years, i.e., $697,522. However, because the $697,522 salary was based on Tim working 50–70 hours per week, the court adjusted the figure to reflect a 40–hour work week. Consequently, the court set Tim's expected annual income from Orthodontic Specialists at $465,000 (rounded). Next, the court took its finding that Tracy had a current earning capacity of $14.50 per hour, or $30,160 annually. The court then added these income calcula-

tion provided by Tim and did little independent or critical analysis; Ksicinski used only financial data from 2007 (one of Orthodontic Specialists' worst financial years in terms of net income) in making his valuations; Ksicinski did not look to outside sources and industry norms to support his conclusions; and Ksicinski's valuation was not supported by the record given the fact that Tim had bought the practice in the 1990s for over $900,000 and the business grossed in excess of $1.6 million per year.

[9] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

tions to the other sources of income available to the parties, specifically rental and investment income, and found that Tim's total annual income was $535,806 (or $44,650/month) and Tracy's total annual income was $75,944 (or $6,328/month).

¶ 16. With these figures in hand, the court considered the statutory factors set forth in Wis. Stat. § 767.56 in deciding whether to award maintenance.[10] In considering these factors, the court found that it was unlikely that Tracy would ever have Tim's earning capacity or an income that would allow for a standard of living comparable to that enjoyed during the marriage. The court also underscored that Tracy had contributed to the dental education and increased earning capacity of Tim. Based on these findings, the court awarded Tracy maintenance in the amount of $16,000 per month for a period of 20 years.

¶ 17. Tim appealed and the court of appeals affirmed. *McReath v. McReath,* 2010 WI App 101, 329 Wis. 2d 155, 789 N.W.2d 89. Tim argued that the circuit court erred as a matter of law when it treated his personal[11] goodwill in Orthodontic Specialists as divisible property. *Id.,* ¶ 1. The court of appeals affirmed on the basis that the personal goodwill was salable, as evidenced by the fact that Tim himself had paid for the personal goodwill of Dr. Grady when he bought the

---

[10] *See infra* note 17 and the accompanying text for a list of the Wis. Stat. § 767.56 factors and a discussion of maintenance awards in Wisconsin.

[11] The court of appeals uses the term "professional goodwill" to describe what we later discuss as "personal goodwill," and the term "corporate goodwill" to describe what we later discuss as "enterprise goodwill." *See infra* section II.B. To avoid confusion, we use the terms we employ herein to describe the court of appeals decision.

orthodontic practice and the reality that any hypothetical buyer would demand a noncompete agreement. *Id.,* ¶¶ 17–18. Because there is no rule excluding salable goodwill from divisible property, the court of appeals concluded that the circuit court did not err when it included personal goodwill in the marital estate. *Id.,* ¶ 19.

¶ 18. Additionally, Tim argued that the circuit court improperly double counted his personal goodwill in Orthodontic Specialists. The goodwill, he averred, was counted first when it was considered a divisible asset. It was then counted a second time when maintenance was awarded based on his earning capacity that was calculated, in part, using his personal goodwill. *Id.,* ¶ 32. The court considered three alternatives to address Tim's double counting concerns. First, as suggested by Tim, circuit courts could exclude all personal goodwill, regardless of whether it is salable, from property division. *Id.,* ¶¶ 35–46. The court rejected this alternative. *Id.,* ¶ 46. Second, also suggested by Tim, circuit courts could include salable personal goodwill in divisible property, and then compensate by making a downward adjustment when awarding maintenance. *Id.,* ¶¶ 47–49. The court also rejected this alternative. *Id.,* ¶ 49.

¶ 19. Third, the court considered Tracy's suggested approach that it characterized as: "include all salable goodwill, both [enterprise] and [personal], as a divisible asset and then, essentially, ignore the fact that Tim's earnings are intertwined with part of the divisible assets." *Id.,* ¶ 50. Having rejected the two approaches advocated by Tim, the court adopted Tracy's approach, opining that there was no "existing rule precluding this approach." *Id.* Accordingly, the court of appeals affirmed the property division and maintenance awarded.

¶ 20. We granted review and now affirm the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶ 21. The division of marital property and the calculation of maintenance are matters typically left to the sound discretion of the circuit court. *Rohde-Giovanni v. Baumgart,* 2004 WI 27, ¶ 17, 269 Wis. 2d 598, 676 N.W.2d 452; *Cook v. Cook,* 208 Wis. 2d 166, 171, 560 N.W.2d 246 (1997). We do not disturb a circuit court's discretionary determinations about property division and the calculation of maintenance unless the court erroneously exercised its discretion. *Rohde-Giovanni,* 269 Wis. 2d 598, ¶ 17. A circuit court erroneously exercises its discretion if it makes an error of law. *Id.,* ¶ 18. The issues presented here concern whether the circuit court applied incorrect legal standards in dividing marital property and calculating maintenance.

¶ 22. When an issue of law arises while we are reviewing a circuit court's exercise of discretion, we review that issue independently, but benefiting from the analyses of the court of appeals and circuit court. *Id.,* ¶ 19; *Marder v. Bd. of Regents of the Univ. of Wis. Sys.,* 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110. Moreover, in deciding legal issues, we uphold the circuit court's findings of fact unless they are clearly erroneous. *Phelps v. Physicians Ins. Co. of Wis., Inc.,* 2009 WI 74, ¶ 34, 319 Wis. 2d 1, 768 N.W.2d 615. "[T]he valuation of marital assets is a finding of fact." *Liddle v. Liddle,* 140 Wis. 2d 132, 136, 410 N.W.2d 196 (Ct. App. 1987).

657

## B. Marital Estate and Goodwill

¶ 23. Chapter 767 of the Wisconsin Statutes, "Actions Affecting the Family," sets forth how a presiding court should divide the marital estate upon divorce. Wisconsin Stat. § 767.61(1) requires the court to divide the property of the parties upon divorce. Section 767.61(2) identifies property that is subject to division by describing the limited types of property that generally are not subject to division on divorce.[12] The property subject to division is considered the marital estate for purposes of property division upon divorce. *Steinke v. Steinke,* 126 Wis. 2d 372, 380, 376 N.W.2d 839 (1985).

¶ 24. When engaged in dividing the marital estate, a circuit court is to proceed under the presumption of equal division. Wis. Stat. § 767.61(3). Dividing the estate equally "effectuates the policy that each spouse

---

[12] Excluded property includes:

property shown to have been acquired by either party prior to or during the course of the marriage . . .:

1. As a gift from a person other than the other party.

2. By reason of the death of another, including, but not limited to, life insurance proceeds; payments made under a deferred employment benefit plan, as defined in s. 766.01(4)(a), or an individual retirement account; and property acquired by right of survivorship, by a trust distribution, by bequest or inheritance or by a payable on death or a transfer on death arrangement under ch. 705

3. With funds acquired in a manner provided in subd. 1. or 2.

Wis. Stat. § 767.61(2)(a). If excluding this property "will create a hardship on the other party or on the children of the marriage," the court may nonetheless divide the property in a "fair and equitable manner." § 767.61(2)(b).

makes a valuable contribution to the marriage and that each spouse should be compensated for his or her respective contributions." *Steinke,* 126 Wis. 2d at 380–81. We have explained the rationale behind equal division when one spouse leaves the work force to care for the couple's domestic needs:

> Part of the rationale in creating the presumption of equal property division is that the homemaking partner has contributed services which have enabled the financially supporting partner to achieve his or her station in life, and in so doing the homemaking partner has lost ground in the job market.

*Id.* (internal quotation marks and citation omitted). Despite the presumption of equal division, the court has the discretion to alter the distribution after considering numerous factors.[13]

---

[13] Those factors, enumerated in Wis. Stat. § 767.61(3), are:

(a) The length of the marriage.

(b) The property brought to the marriage by each party.

(c) Whether one of the parties has substantial assets not subject to division by the court.

(d) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

(e) The age and physical and emotional health of the parties.

(f) The contribution by one party to the education, training or increased earning power of the other.

(g) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.

■ 25. Property valued for the purpose of dividing the marital estate should be valued at its fair market value. *Liddle,* 140 Wis. 2d at 138. "Fair market value is the price that property will bring when offered for sale by one who desires but is not obligated to sell and bought by one who is willing but not obligated to buy." *Id.*

■ 26. In this case, the issue is whether the entire value of the salable professional goodwill in Orthodontic Specialists is included in the marital estate subject to division under Wis. Stat. § 767.61. Subsection 767.61(2) does not explicitly exclude professional goodwill from the divisible marital estate. Consequently, we turn to the applicable case law and policy considerations to decide whether the entire value of the salable professional goodwill is subject to property division.

(h) The desirability of awarding the family home or the right to live therein for a reasonable period to the party having physical placement for the greater period of time.

(i) The amount and duration of an order under s. 767.56 granting maintenance payments to either party, any order for periodic family support payments under s. 767.531 and whether the property division is in lieu of such payments.

(j) Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.

(k) The tax consequences to each party.

(L) Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

(m) Such other factors as the court may in each individual case determine to be relevant.

¶ 27. Defining professional goodwill is a necessary starting point. In 1967, we recognized a business's goodwill as a divisible marital asset. *Spheeris v. Spheeris,* 37 Wis. 2d 497, 155 N.W.2d 130 (1967). In doing so, we underscored the difficulty in defining the concept, but set forth the following definition:

> In its broadest sense the intangible asset called good will may be said to be reputation; however, a better description would probably be that element of value which inheres in the fixed and favorable consideration of customers arising from an established and well-conducted business.

*Id.* at 504 (footnote and internal quotation marks omitted). Similarly, the court of appeals has advanced the following definition:

> The advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partiality or prejudices.

*Holbrook v. Holbrook,* 103 Wis. 2d 327, 345, 309 N.W.2d 343 (Ct. App. 1981) (citing 38 Am. Jur. 2d., Goodwill § 1 (1968)). Stated another way, goodwill is "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, [especially] for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets." *Black's Law Dictionary* 763 (9th ed. 2009). Simply stated, goodwill is

"an asset of recognized value beyond the tangible assets of [a business]." *Taylor v. Taylor,* 386 N.W.2d 851, 857 (Neb. 1986).

¶ 28. Originally, it was posited that goodwill did not inhere in professional businesses because professional businesses depend on the skill and reputation of the professional. *Holbrook,* 103 Wis. 2d at 346. However, courts and scholars now recognize goodwill in professional businesses. *See, e.g., id.* at 347–49; *Peerenboom v. Peerenboom,* 147 Wis. 2d 547, 550–52, 433 N.W.2d 282 (Ct. App. 1988); *Golden v. Golden,* 75 Cal. Rptr. 735, 737–38 (Ct. App. 1969); Christopher A. Tiso, *Present Positions on Professional Goodwill: More Focus or Simply More Hocus Pocus?,* 20 J. Am. Acad. Matrimonial L. 51, 52 (2006) [hereinafter "Tiso, *Present Positions*"]. When goodwill inheres in a professional business, it is most properly classified as "professional goodwill." Tiso, *Present Positions,* at 52.

¶ 29. As aforementioned, we recognized goodwill as part of the divisible marital estate as early as 1967. In *Spheeris,* in order to calculate Mr. Spheeris's net worth for the divorce judgment, the circuit court included the value of the goodwill attributable to the retail discount store owned by Mr. Spheeris. *Spheeris,* 37 Wis. 2d at 503. Mr. Spheeris did not challenge the inclusion of goodwill as a divisible marital asset; rather, he challenged the valuation of the goodwill by use of predictive formulas, absent a sale of the business. *Id.* at 506. In other words, Mr. Spheeris argued that "the only way to establish [goodwill] is through a purchase price agreed upon in a voluntary arm's-length transaction." *Id.*

¶ 30. We disagreed, holding that there need not be an actual sale in order to determine the existence and value of a business's goodwill. We stated:

> It is true that the best indicator of [goodwill] would be such a purchase price. However, there is no authority in Wisconsin that would either proscribe or preclude the use of mathematical computations to determine the value of [goodwill]. Actually, the employment of such mathematical formulas in determining [goodwill] appears to be widespread.

*Id.* We opined further that when determining the value of goodwill, there are no prescribed formulas the circuit court must apply. *Id.*

¶ 31. While *Spheeris* involved a commercial business, subsequent Wisconsin cases have recognized goodwill in professional practices. In *Holbrook,* Mr. Holbrook was a partner in a large law firm. *Holbrook,* 103 Wis. 2d at 330. The court of appeals considered whether the circuit court had erroneously determined that the goodwill in Mr. Holbrook's partnership interest in the law firm was a divisible marital asset. *Id.* at 344. In concluding that the circuit court did err, the court began its discussion with a blanket statement that, standing alone, would imply the court was prohibiting any inclusion of professional goodwill in the divisible marital estate. The court stated, "[w]e are not persuaded that the concept of professional goodwill as a divisible marital asset should be adopted in Wisconsin." *Id.* at 350.

¶ 32. However, the court's subsequent discussion focused on its assumption that professional goodwill cannot be sold, and "accrues to the benefit of the owners only through increased salary." *Id.* For instance, the court compared the professional goodwill in Mr. Holbrook's partnership interest to a professional de-

gree. It opined that "[l]ike an educational degree, a partner's theoretical share of a law firm's goodwill *cannot be exchanged on an open market: it cannot be assigned, sold, transferred, conveyed or pledged.* . . . In both cases, the 'asset' involved *is not salable* and has computable value to the individual only to the extent that it promises increased future earnings." *Id.* at 351 (emphasis added) (footnote omitted). Moreover, the court underscored that, apart from receiving the value of his capital account, Mr. Holbrook was "[e]thically and contractually . . . prevented from otherwise disposing of his interest" in the firm. *Id.* at 352.

¶ 33. Accordingly, Wisconsin courts considering the valuation of professional goodwill subsequent to *Holbrook* have limited *Holbrook*'s assertion that professional goodwill is not part of the divisible marital estate to situations where the professional goodwill is nonsalable. For example, in *Peerenboom,* the court of appeals concluded that the goodwill in a divorcing spouse's dental practice could be a divisible marital asset. *Peerenboom,* 147 Wis. 2d at 552. The court distinguished *Holbrook:*

> *Holbrook* . . . involved the division of an individual lawyer's interest in a large law firm. The court explained that due to ethical and contractual considerations, his interest in the law firm's goodwill could not be exchanged or sold on the open market. The court concluded therefore that it would be inequitable to compel "a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value." . . .
>
> In contrast, in this case the record shows no ethical or contractual barrier to [Dr. Peerenboom's] disposing of his interest in his dental practice. Accordingly, to the extent that the evidence shows that the goodwill exists,

> is marketable, and that its value is something over and above the value of the practice's assets and the professional's skills and services, it may be included as an asset in the marital estate and be subject to division.

*Id.* at 551–52 (quoting *Holbrook,* 103 Wis. 2d at 351).

¶ 34. Similarly, in *Sommerfield v. Sommerfield,* 154 Wis. 2d 840, 454 N.W.2d 55 (Ct. App. 1990), the court of appeals held that the circuit court erred when, for the purpose of setting the value of Mr. Sommerfield's accounting practice, it disregarded the expert witness's valuation of the practice's goodwill. *Id.* at 852–54. Starting with the premise that goodwill can be a marketable asset, the court underscored the expert's opinion that a noncompete agreement covering two years would be the normal condition under which a practice like Mr. Sommerfield's would be sold. *Id.* at 853. Concluding that there was no evidence that such a noncompete agreement would be unenforceable, the court held that the circuit court erroneously found that there was not separate, marketable goodwill in Mr. Sommerfield's practice that could be included in the divisible marital estate. *Id.* at 854.

■■

¶ 35. In accordance with previous Wisconsin case law, we conclude today that when valuing a business interest that is part of the marital estate for purposes of divorce, a circuit court shall include the value of the salable professional goodwill attendant to the business interest.[14] In addition to the above discussed case law,

--------

[14] In the case before us, there was no contention that the business interest in Orthodontic Specialists was not part of the marital estate. Rather, the issue presented turned on how that interest was to be valued. However, there may be occasions when the issue is whether the business interest should be

this conclusion is supported by Wis. Stat. § 767.61 and the policy considerations behind § 767.61.

¶ 36. First, while Wis. Stat. § 767.61(2) excludes specific property from the marital estate, professional goodwill is not listed therein. Moreover, under § 767.61(3), we presume that the marital estate should be divided equally. As aforementioned, the presumption of equal division recognizes the contributions of each spouse to the marriage, including a homemaker spouse's lost earning capacity from being out of the job market. Where the salable professional goodwill is developed during the marriage, it defies the presumption of equality to exclude it from the divisible marital estate. As one court has explained:

> [T]he wife, by virtue of her position of wife, made to that [goodwill] value the same contribution as does a wife to any of the husband's earnings and accumulations during the marriage. She is as much entitled to be recompensed for that contribution as if it were represented by the increased value of stock in a family business.

*Golden,* 75 Cal. Rptr. at 738.[15]

¶ 37. In sum, pursuant to Wis. Stat. § 767.61, Wisconsin case law and the policy supporting the presumption of equality in the division of the marital estate, we hold that a circuit court shall include salable professional goodwill in the divisible marital estate

included in the marital estate in the first instance. *See Steinmann v. Steinmann,* 2008 WI 43, ¶¶ 28–29, 309 Wis. 2d 29, 749 N.W.2d 145.

[15] In *Golden v. Golden,* 75 Cal. Rptr. 735 (Ct. App. 1969), the non-professional spouse was the wife. We recognize that the roles could easily be reversed, with the non-professional spouse being the husband.

when the business interest to which the goodwill is attendant is an asset subject to § 767.61.

¶ 38. Tim urges us to require circuit courts to divide professional goodwill into two subgroups, "personal" goodwill and "enterprise" goodwill, and to create a presumption that personal goodwill is excluded from the marital estate. This is an approach taken by some courts and scholars. *See* Tiso, *Present Positions,* at 53.

■■

¶ 39. When professional goodwill is so divided, enterprise goodwill is characterized as "[g]oodwill in a professional practice . . . attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business." *Id.* (quoting *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999)); *see also May v. May,* 589 S.E.2d 536, 541–42 (W. Va. 2003). Personal goodwill, on the other hand, is characterized as the goodwill that is "attributable to the individual owner's personal skill, training or reputation," i.e., it is "the goodwill that depends on the continued presence of a particular individual." *Id.* (quoting *Yoon,* 711 N.E.2d at 1268–69); *see also May,* 589 S.E.2d at 542.

¶ 40. Some courts that divide professional goodwill into enterprise and personal goodwill have concluded that enterprise goodwill is included in the divisible marital estate, and personal goodwill is not. This conclusion is based in large part on the belief that enterprise goodwill is salable, while personal goodwill is not. For instance, in *Yoon,* the Supreme Court of Indiana included enterprise goodwill in the divisible estate, explaining that while "[i]t is not necessarily marketable in the sense that there is a ready and easily priced market for it, [] it is in general transferable to

others and has a value to others." *Yoon,* 711 N.E.2d at 1269. With respect to personal goodwill, however, the *Yoon* court explained that because personal goodwill depends on the continued presence of the particular professional, it "represents nothing more than the future earning capacity of the individual." *Id.* Consequently, based on its belief that personal goodwill is not salable, the *Yoon* court excluded personal goodwill from the marital estate. *Id.; see also Antolik v. Harvey,* 761 P.2d 305, 317–18 (Haw. Ct. App. 1988).

¶ 41. After reviewing cases that distinguish between personal and enterprise goodwill, we choose not to require circuit courts to draw a distinction between personal and enterprise goodwill when dividing a marital estate that includes professional goodwill. This is so because the premise on which the distinction is grounded—that enterprise goodwill is salable and personal goodwill is not—is mistaken. As evidenced by the facts of the case at hand, Tim testified that when he bought Orthodontic Specialists for $930,000, nearly 90 percent of the sale price was for the professional goodwill. Tim described this goodwill as including elements of "personal" goodwill: "Dr. Grady's name, the noncompete clause, and the employment agreement that Dr. Grady would stay on to introduce me to his existing patients." Therefore, as this case demonstrates, in some situations, personal goodwill is salable.

## C. Maintenance and Double Counting

¶ 42. Having concluded that a circuit court shall consider salable professional goodwill, including what some courts term "personal" goodwill, as a divisible

marital asset, we now set forth the law applicable to the second issue presented. The second issue presented is whether the circuit court double counted the value of Tim's professional goodwill by basing Tracy's maintenance award on Tim's expected future earnings when the future earnings will arise from Orthodontic Specialists. Under Tim's line of reasoning, the circuit court counted the goodwill once when it treated the goodwill as a divisible marital asset. Tim contends that the court then counted professional goodwill a second time when it awarded maintenance based on his past earnings from Orthodontic Specialists, given that professional goodwill increased those past earnings.

¶ 43. We begin with an overview of maintenance in Wisconsin. Maintenance awards[16] upon a divorce are governed by Wis. Stat. § 767.56. Pursuant to § 767.56, a circuit court "may grant an order requiring maintenance payments to either party for a limited or indefinite length of time" after considering a list of enumerated factors.[17] As aforementioned, it is within the

---

[16] Generally, maintenance is "[f]inancial support given by one person to another, [usually] paid as a result of a legal separation or divorce." *Black's Law Dictionary* 1039 (9th ed. 2009).

[17] Those factors are:

(1) The length of the marriage.

(2) The age and physical and emotional health of the parties.

(3) The division of property made under s. 767.61.

(4) The educational level of each party at the time of marriage and at the time the action is commenced.

(5) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial

circuit court's discretion to determine the amount and duration of maintenance. *Rohde-Giovanni,* 269 Wis. 2d 598, ¶ 17. However, the factors enumerated in § 767.56 should be the "touchstone of analysis" when a court sets maintenance. *LaRocque v. LaRocque,* 139 Wis. 2d 23, 32, 406 N.W.2d 736 (1987).

¶ 44. There are two objectives that an award of maintenance seeks to meet. The first objective is support of the payee spouse. *Id.* at 33. This objective may not be met by merely maintaining the payee spouse at a subsistence level. *Id.* at 35. Rather, maintenance should support the payee spouse at the pre-divorce standard. *Id.* This standard should be measured by "the lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate enjoying if they were to stay married." *Id.* at 36. The second

---

responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(7) The tax consequences to each party.

(8) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, if the repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(9) The contribution by one party to the education, training or increased earning power of the other.

(10) Such other factors as the court may in each individual case determine to be relevant.

670

objective is fairness, which aims to "compensate the recipient spouse for contributions made to the marriage, give effect to the parties' financial arrangements, or prevent unjust enrichment of either party." *Id.* at 33.

¶ 45. When determining the appropriate maintenance award, we have instructed courts to start with "the proposition that the dependent partner may be entitled to 50 percent of the total earnings of both parties" and then make any needed adjustments after considering the Wis. Stat. § 767.56 factors. *Bahr v. Bahr,* 107 Wis. 2d 72, 85, 318 N.W.2d 391 (1982); *see also Heppner v. Heppner,* 2009 WI App 90, ¶ 12, 319 Wis. 2d 237, 768 N.W.2d 261. Notwithstanding the proscribed starting point, "[t]he payment of maintenance is not to be viewed as a permanent annuity." *Vander Perren v. Vander Perren,* 105 Wis. 2d 219, 230, 313 N.W.2d 813 (1982). Rather, maintenance is "designed to maintain a party at an appropriate standard of living, under the facts and circumstances of the individual case, until the party exercising reasonable diligence has reached a level of income where maintenance is no longer necessary." *Id.*

¶ 46. As is the case here, concerns about double counting sometimes arise when awarding maintenance. We first pronounced the rule against double counting in *Kronforst v. Kronforst,* 21 Wis. 2d 54, 123 N.W.2d 528 (1963). At issue in *Kronforst* was the counting of Mr. Kronforst's interest in his employment profit-sharing trust. The trust was set up so that, upon termination of his employment, Mr. Kronforst could either withdraw his interest from the trust or have his interest disbursed to him in monthly installments over ten years. *Id.* at 63. When dividing the marital estate upon the

couple's divorce, the circuit court included, as a divisible asset, Mr. Kronforst's interest in the trust and awarded the interest to him.[18] *Id.*

¶ 47. On review, we concluded that the circuit court properly included Mr. Kronforst's interest in the trust in the divisible estate. We held, however, that the circuit court erred when it also considered the payments from the trust as Mr. Kronforst's income when calculating maintenance. *Id.* at 63–64. We underscored that at the time of trial, Mr. Kronforst was on extended medical leave, and therefore, "all probabilities" were that he would not return to work, meaning that his interest in the trust would not grow. *Id.* at 63. As such, we opined:

> We view the matter no differently than if the $9,749 had constituted cash in a bank deposit standing in defendant's name. Such an asset cannot be included as a principal asset in making division of the estate and then also as an income item to be considered in awarding alimony.

*Id.* at 64.

¶ 48. Our case law since *Kronforst* has refined the rule against double counting. In *Hommel v. Hommel,* 162 Wis. 2d 782, 471 N.W.2d 1 (1991), we held that, generally, it did not violate the rule against double counting to include "investment income from assets awarded to a spouse as part of an equal division of property pursuant to a divorce settlement [when] calculating that spouse's income for purposes of revising a maintenance award to the payee spouse." *Id.* at 793. In so holding, we relied in part on the court of appeal's

---

[18] Ms. Kronforst was awarded 49 percent of the net estate, and Mr. Kronforst was awarded 51 percent. *Kronforst v. Kronforst,* 21 Wis. 2d 54, 60, 123 N.W.2d 528 (1963).

rationale and holding in *Pelot v. Pelot,* 116 Wis. 2d 339, 342 N.W.2d 64 (Ct. App. 1983).

¶ 49. In *Pelot,* when dividing the marital estate, the circuit court assigned Mr. Pelot his union pension fund. *Id.* at 341. The fund was calculated to have a present value of $9,680 at the time of the property division. *Id.* Later, when Mr. Pelot moved to modify the maintenance Mr. Pelot was paying to Ms. Pelot, the circuit court included in Mr. Pelot's income the monthly benefits from the pension fund. *Id.* at 342. On review, the court of appeals acknowledged the *Kronforst* rule against double counting, asserting that "[i]f the present value is included in the estate, then the pension payments themselves are not [to be] counted as income for purposes of fixing maintenance when the divorce is granted." *Id.* at 343.

¶ 50. The court went on, however, to question whether the *Kronforst* rule is absolute. *Id.* at 344. Specifically, the court underscored that there is a close relationship between maintenance and property division, as evidenced by the fact that, pursuant to Wis. Stat. § 767.26(3) (1981–82), one of the factors that a circuit court must consider in setting maintenance is the property division.[19] *Id.* Because of this close relationship between maintenance and property division, the court concluded that "if the value of a pension fund is included in the property division, the court may consider it when making a maintenance award, al-

---

[19] The court of appeals pointed out that *Kronforst* was decided before the 1977 Divorce Reform Act. *Pelot v. Pelot,* 116 Wis. 2d 339, 344, 342 N.W.2d 64 (Ct. App. 1983). Consequently, the statute in effect at that time did not include the enumerated factors. *See generally* Wis. Stat. ch. 247 (1963). However, as with Wis. Stat. § 767.26(3) (1981–82), one factor listed in Wis. Stat. § 767.56 is the division of marital property.

though it must be considered differently from property which can be presently enjoyed." *Id.* at 345.

¶ 51. Based on this conclusion, the court held that "the trial court should exclude from [Mr. Pelot's] income his monthly retirement benefits *until* those benefits total $9,680, the value of the fund when it was assigned to him in the divorce." *Id.* at 342–43 (emphasis added). Once Mr. Pelot received the value of the pension assigned to him when the marital estate was divided (i.e., the $9,680), then his pension benefits could be considered income. *Id.* at 346. We have since applied the same rule as the court of appeals applied in *Pelot* for when pension benefit payouts can be considered income in awarding maintenance. *Olski v. Olski,* 197 Wis. 2d 237, 251, 540 N.W.2d 412 (1995) (assuming, based on the facts in the record, that the employee husband had received the full value of the pension benefits awarded him in the property division and holding, therefore, that "all future receipts of pension benefits are available in their entirety for possible maintenance obligations").

¶ 52. Our reliance on *Pelot* in *Hommel* illustrates our rationale in *Hommel* for concluding that investment income that arises from a divided asset can be considered when determining maintenance.[20] As in *Pelot,* in the typical property division case involving a pension, the trial court may determine the present value of the pension.[21] When the present value of a

---

[20] While we were not as explicit in explaining our rationale as we could have been in *Hommel,* we now attempt to better illuminate the rationale underlying our holding.

[21] "We have long recognized that a pension interest is very difficult to value." *Olski v. Olski,* 197 Wis. 2d 237, 248, 540 N.W.2d 412 (1995) (citations and internal quotation marks

pension plan is calculated, that present value is based, in part, on projected future benefit payments. *See generally Pelot,* 116 Wis. 2d at 341–43; *see also Bloomer v. Bloomer,* 84 Wis. 2d 124, 130–32, 267 N.W.2d 235 (1978) (explaining how numerous courts have calculated the present value of pension funds for property division purposes). Therefore, assuming the employee spouse is awarded the present value of the asset, he or she does not receive the value of the asset at the time of the property division. Rather, the spouse receives that value via future payments. Accordingly, as the court of appeals in *Pelot* underscored, it would be double counting to count the present value of the pension as a divisible asset and also count the future payments as income, since the income, up to the valuation placed on the pension at the time of the division, are one and the same.

¶ 53. Contrarily, when an income earning asset is assigned to one spouse, as in *Hommel,* that spouse, generally, receives the full fair market value of that asset at the time of the property division. Stated other-

omitted). As we have explained, "[t]he problem of valuing prospective benefits under a pension plan is frequently exacerbated by the fact that unmatured rights may be terminated by death, discharge, or other contingencies. . . . Valuation is further complicated by the dual nature of most pension plans. If the employee continues to work until retirement, the payments to the employee, to the extent derived from employer's contributions, are in the nature of deferred compensation. If, however, the employee terminates work before retirement age, the usual plan provides at least for the return of employee contributions." *Bloomer v. Bloomer,* 84 Wis. 2d 124, 130, 267 N.W.2d 235 (1978) (internal citations omitted). This complexity underscores the necessity to give trial courts "broad discretion in valuing pension rights." *Id.* at 134.

wise, if the spouse was awarded income property, that spouse could turn around and sell the income property the next day and, thereby, attain the value of the property. The spouse could also elect to keep the property and earn income from it. As the spouse earns income, he or she does not lose the value of the property because he or she always has the option to sell the property for fair market value. Therefore, unlike pension benefit payments (up to the present value placed on the pension at the time of the division), the value of investment property is separate from the income it generates. Consequently, as *Hommel* held, counting income from income earning assets will typically not implicate double counting. *Hommel,* 162 Wis. 2d at 792; *see also, Heppner,* 319 Wis. 2d 237, ¶ 18 (concluding there is no improper double counting when income from stock options awarded during property division is included in income when calculating maintenance).

¶ 54. Several years after *Hommel,* in 1997, we again analyzed the contours of the rule against double counting. *Cook,* 208 Wis. 2d at 175–85. The issue in *Cook* was whether a military pension that was divided between the spouses in the property division could also be considered income when calculating maintenance. *Id.* at 175. While the facts of *Cook* did not require us to "ascertain the precise scope of *Kronforst*'s 'double-counting' rule," from our review of the double-counting case law, we concluded any prohibition of double counting must be flexible. *Id.* at 179. Namely, we opined that given the "infinite range of factual situations facing circuit courts in dividing property and determining maintenance and child support," it would be unwise to proscribe inflexible double-counting rules. *Id.* at 180. Instead, we stressed that "the 'double-counting' rule serves to warn parties, counsel and the courts to avoid

unfairness by carefully considering the division of income-producing and non-income-producing assets and the probable effects of that division on the need for maintenance and the availability of income to both parents for child support." *Id.* In short, when analyzing whether there has been double counting, the focus should be on fairness, not rigid double-counting rules.

### D. Application

### a. Goodwill

¶ 55. We now apply the legal principles set forth above to the facts and circumstances of this case. Starting with the value of professional goodwill in Orthodontic Specialists, Tim contends that the entire value of the salable professional goodwill in Orthodontic Specialists should not be included in the divisible marital estate. Specifically, Tim would like what he classifies as personal goodwill to be excluded.[22] Notably, Tim does not argue that, if, as a matter of law, the entire value of Orthodontic Specialists' salable goodwill is includable in the marital estate, the circuit court's finding that Orthodontic Specialists' value is $1,058,000 was clearly erroneous. Nor does he challenge that the property should be divided equally.

■■■

¶ 56. Pursuant to our conclusion above, *see supra* II.B., the entire amount of *salable* professional goodwill was appropriately included in the marital estate. Here, Tim has not shown that the $1,058,000 value placed on Orthodontic Specialists includes nonsalable goodwill. Rather, the facts indicate the contrary. In particular,

---

[22] Tim does not aver that enterprise goodwill is excludable from the marital estate. *See supra* ¶ 17 above.

Tim bought the practice, over a decade ago, for $930,000. Approximately 90 percent of this purchase price was paid for goodwill. Moreover, Tim testified that this goodwill included "Dr. Grady's name, the noncompete clause, and the employment agreement that Dr. Grady would stay on to introduce me to his existing patients, [and] to counsel me through the process of learning how to do business," much of which is included in what Tim classifies as personal goodwill.

¶ 57. As the sale from Dr. Grady to Tim shows, personal goodwill in an orthodontic practice is salable. It is appropriate to include the salable goodwill from Orthodontic Specialists in the divisible marital estate. *See Sommerfield,* 154 Wis. 2d at 854.

¶ 58. Moreover, the record is replete with evidence that Tracy contributed to the development and success of Orthodontic Specialists. There is no question that she helped to create the business's goodwill. Consequently, under the statutory presumption of an equal division of the marital estate and the contributions of both parties to the creation of the marital estate herein, the circuit court did not erroneously exercise its discretion when it included the goodwill associated with Orthodontic Specialists in the marital estate and divided it on a 50:50 basis. Stated otherwise, the circuit court did not erroneously exercise its discretion when it included the entire $1,058,000 value of Orthodontic Specialists' goodwill in the marital estate.

### b. Double counting

¶ 59. Tim argues that the circuit court double counted the value of his professional goodwill when it included the goodwill in the divisible marital estate, and then based Tracy's maintenance award on Tim's ex-

pected future earnings. According to Tim, the expected future earnings also included the value of the goodwill because it was calculated using Tim's average income over the preceding five years which was increased by the goodwill. We disagree.

¶ 60. We start by underscoring our directive in *Cook* that the rule against double counting is advisory and not absolute. *Cook,* 208 Wis. 2d at 180. As set forth above, the double counting rule does not prohibit the inclusion of investment income from assets awarded to a spouse as part of property division when calculating maintenance. *Hommel,* 162 Wis. 2d at 792. This is so because the value of the investment asset is separate from the income it produces. Contrarily, pension benefit payouts (until they reach the amount of the valuation given the pension as an asset at the time of the property division) do not create value separate from the pension as an asset at the time of the property division. *Olski,* 197 Wis. 2d at 243–51; *Pelot,* 116 Wis. 2d at 343. Applying these principles to the case at hand, we conclude that the salable professional goodwill in Orthodontic Specialists is similar to an asset that produces income.

¶ 61. As with an income producing asset, the value of Orthodontic Specialists at the time of the property division had a set value, namely, $1,058,000. If Tim so chose, at the time of the property division, he could have sold Orthodontic Specialists and realized this value. Or, he could retain Orthodontic Specialists, earn income from it and sell it at a later time. Consequently, Tim has the option of continuing to generate substantial income from Orthodontic Specialists without diminishing its value. Specifically, the circuit court found that if Tim works 40 hours per week, Tim's income will be $465,000 annually. As with income from

an income earning asset, this income is separate from the value of Orthodontic Specialists as it existed at the time of the property division. Consequently, the circuit court did not double count Orthodontic Specialists' professional goodwill and, therefore, did not erroneously exercise its discretion when it awarded Tracy $16,000 per month, for 20 years, in maintenance.

## III. CONCLUSION

¶ 62. We conclude the entire value of salable professional goodwill was properly counted as divisible property in the marital estate. Moreover, we conclude that the circuit court did not double count the professional goodwill from Orthodontic Specialists in the maintenance award. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.