COURT OF APPEALS
DECISION
DATED AND FILED

July 3, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1569**

Cir. Ct. No. 2022FA272

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN RE THE MARRIAGE OF:

DOUGLAS S. BUCK,

PETITIONER-RESPONDENT,

V.

EMILY W. BUCK,

RESPONDENT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1  PER CURIAM. Emily Buck appeals the amount and term of maintenance ordered in the judgment of divorce dissolving her long-term marriage to Douglas Buck.[1]  Emily argues that the circuit court erroneously exercised its discretion by misapplying, or failing to apply, statutory factors and case law governing maintenance, and by failing to properly consider the fairness and support objectives before ordering Douglas to pay Emily $8,000 a month for six years.  We conclude that Emily fails to show that the court erroneously exercised its discretion in setting either the amount or the term of maintenance, and accordingly we affirm the judgment.[2]

## BACKGROUND

¶2  Emily and Douglas were married in 1997.  Douglas filed for divorce in February 2022.  The parties resolved many issues in a partial marital settlement agreement.  The circuit court determined that the partial marital settlement agreement is "fair and reasonable" in all respects.  That determination is not contested on appeal.  Among the issues resolved in the agreement was that the parties agreed to divide the marital property equally, including the cash generated by the sale of the marital residence.

---

[1]  From this point forward we use the first names of the parties because they share a last name.

[2]  Both sets of appellate briefs fail to comply with WIS. STAT. RULE 809.19(8)(bm), which states that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover." This rule was amended in 2021, *see* S. CT. ORDER 20-07 (eff. July 1, 2021), because briefs are now electronically filed in PDF format and are electronically stamped with page numbers when they are accepted for e-filing.  The pagination requirement of the amended rule ensures that the numbers on each page of the brief "will match ... the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief.  Supreme Court Note, 2021, WIS. STAT. RULE 809.19.

¶3      Most pertinent here, in the partial marital settlement agreement Douglas waived the right to receive maintenance and he agreed to pay some amount of maintenance to Emily, but the parties intentionally left to be resolved at a bench trial the amount and the term of the maintenance.

¶4      In anticipation of the bench trial, the parties filed briefs with the circuit court, along with financial disclosures and other exhibits. The court held a one-day trial in June 2023. At the close of trial, the court made oral rulings. These rulings were incorporated into the findings of fact, conclusions of law, and judgment of divorce.

¶5      The following background is undisputed.

¶6      At the time of trial, Emily was 53 and generally healthy. She had an undergraduate degree in art history and a pre-marriage work history of working in a gift shop. With the marriage, Emily left the workforce to become a stay-at-home mother and homemaker, and within four years the parties had two children, both of whom were adults by the time of the trial. Although Emily was not employed at the time of trial, the parties agreed in the partial marital settlement agreement to impute to her an annual income of $47,000 for purposes of calculating maintenance.

¶7      At the time of trial, Douglas was 56, in good health, and working as an attorney. His legal career to date had involved working at large law firms, including for the previous six years as the head of the real estate practice group of one such firm. Between the years 2017-21 his annual income ranged from $390,000 to approximately $582,000, and it exceeded $555,000 in each of the years 2019-21 (not adjusted for inflation).

¶8    In their proposals, both sides urged the circuit court to set the amount of maintenance at a level that would provide Douglas with 55 percent of their combined net income (after taxes and other deductions) and provide Emily with 45 percent.

¶9    Douglas asked the circuit court to assume his annual income to be $360,000. Given Emily's agreed imputed income level of $47,000, this produced a combined total net annual income of $260,471. Based on these assumptions, and applying the 55-45 net income split, Douglas asked the court to order him to pay monthly maintenance of $6,602. Regarding the term, Douglas proposed seven years as measured from the date of the filing for divorce (or five and one half years from the judgment of divorce), because this would be "around the time he anticipates winding down his [legal] career," at which time he "may decide to pursue other less demanding employment," at lower earnings rates.[3] He argued that this would be fair in part because the property division leaves Emily with significant assets to invest, which could generate income for her into the future.

¶10    Emily asked the circuit court to assume Douglas's annual income to be $474,583. Given her own imputed income of $47,000, this would produce a combined total net annual income of $395,235. Based on these assumptions, and

---

[3] When asked about his retirement plans at trial, Douglas testified:

> I think I would like to continue working at a large law firm until I'm 60. By that time, my daughters who I have agreed to pay for their health insurance will no longer[—]I can't pay for their health insurance anymore. So I would like to work until I'm 60 at a big law firm and then I would like to find something a little more mellow[,] like work in a kitchen or be a UPS guy. I like to work. I like to be out and about, but I have a very stressful job and I don't want to continue that beyond 60.

applying the 55-45 split, Emily asked the court to order Douglas to pay monthly maintenance of $11,656. Regarding the term, Emily proposed continued maintenance payments "until there has been a substantial change of circumstances for either party, upon either party's death, or Emily's remarriage," with substantial changes of circumstances to be raised with, and determined by, the court as they occur. She argued that the timing and nature of substantial changes in circumstances could not "be predicted at this time with certainty," and she would "not be able to achieve the marital standard of living without continued maintenance."

¶11 In reaching its decision on the amount of monthly maintenance payments, the circuit court viewed the two proposals as "arguably the best case scenarios for each side." The court decided to award to Emily $8,000 per month, or $96,000 per year, which would not be taxable income to her. The court stated that this amount "may not put Emily in exactly the position she was during the marriage, but it is a comfortable amount."

¶12 The circuit court set the maintenance term at six years, commencing on July 1, 2023. The court stated the following in support of this decision:

> This will allow Emily to recover from this process. She will also be past 59 and 1/2[,] which is when she is eligible to start drawing from retirement without penalty. The Court notes that [the parties during the marriage put] a lot of money … aside for retirement and it is being divided equally.

¶13 We reference additional relevant facts and address additional aspects of the circuit court's reasoning as needed in Discussion below.

¶14 Emily appeals.

## DISCUSSION

¶15  A circuit court "may grant an order requiring maintenance payments to either party for a limited or indefinite length of time" after considering "all of" a list of 10 factors, including a catch-all that calls for attention to factors relevant to the particular case.[4]  WIS. STAT. § 767.56(1c).

---

[4] The following are the 10 factors, which should be the "touchstone of analysis," *LaRocque v. LaRocque*, 139 Wis. 2d 23, 31-32, 406 N.W.2d 736 (1987):

> (a) The length of the marriage.
>
> (b) The age and physical and emotional health of the parties.
>
> (c) The division of property made under [WIS. STAT. §] 767.61.
>
> (d) The educational level of each party at the time of marriage and at the time the action is commenced.
>
> (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
>
> (f) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.
>
> (g) The tax consequences to each party.
>
> (h) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, if the repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.
>
> (i) The contribution by one party to the education, training or increased earning power of the other.

(continued)

¶16    A circuit court's determination of a maintenance award is entrusted to "the sound discretion of the circuit court, and we will uphold such [a] determination[] unless the circuit court erroneously exercised its discretion." ***Steinmann v. Steinmann***, 2008 WI 43, ¶20, 309 Wis. 2d 29, 749 N.W.2d 145.  A circuit court erroneously exercises its discretion "when it fails to consider the relevant factors, bases its award on factual errors, makes an error of law, or grants an excessive or inadequate award."  ***Rohde-Giovanni v. Baumgart***, 2004 WI 27, ¶18, 269 Wis. 2d 598, 676 N.W.2d 452; ***Meyer v. Meyer***, 2000 WI 132, ¶15, 239 Wis. 2d 731, 620 N.W.2d 382 ("An erroneous exercise of discretion may arise from an error in law or from the failure of the [circuit] court to base its decision on the facts in the record.").  We uphold the circuit court's findings of fact unless they are clearly erroneous.  ***Young v. Young***, 124 Wis. 2d 306, 310, 369 N.W.2d 178 (Ct. App. 1985).

¶17    An award of maintenance should meet two objectives:  support of the recipient spouse at the pre-divorce standard and not by "merely maintaining the payee spouse at a subsistence level"; and fairness, to "'compensate the recipient spouse for contributions made to the marriage, give effect to the parties' financial arrangements, or prevent unjust enrichment of either party.'"  ***McReath***

---

(j) Such other factors as the court may in each individual case determine to be relevant.

WIS. STAT. § 767.56(1c) (2021-22).  A circuit court needs to consider only the specific factors that are relevant in a given case. ***Trattles v. Trattles***, 126 Wis. 2d 219, 228, 376 N.W.2d 379 (Ct. App. 1985).

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

*v. McReath*, 2011 WI 66, ¶44, 335 Wis. 2d 643, 800 N.W.2d 399 (quoting *LaRocque v. LaRocque*, 139 Wis. 2d 23, 33, 406 N.W.2d 736 (1987)).

¶18    Circuit courts should begin the analysis of how much maintenance to award with the presumption "that the dependent partner may be entitled to 50 percent of the total earnings of both parties" and then make any needed adjustments after considering the WIS. STAT. § 767.56 factors. *Bahr v. Bahr*, 107 Wis. 2d 72, 85, 318 N.W.2d 391 (1982). Courts are to bear in mind that "[t]he payment of maintenance is not to be viewed as a permanent annuity." *Vander Perren v. Vander Perren*, 105 Wis. 2d 219, 230, 313 N.W.2d 813 (1982). Instead, maintenance is "designed to maintain a party at an appropriate standard of living, under the facts and circumstances of the individual case, until the party exercising reasonable diligence has reached a level of income where maintenance is no longer necessary." *Id.*

## I. Amount of Maintenance

¶19    Emily argues that in deciding the amount of maintenance the circuit court failed to properly exercise its discretion because it did not make an explicit finding regarding the amount of Douglas's income and, in the absence of such a finding, failed to explain how it reached the maintenance figure of $8,000 per month. As a result, Emily contends, the court selected an amount that does not financially support the lifestyle that she could have expected to enjoy after the divorce. *See LaRocque*, 139 Wis. 2d at 36 ("We believe that a reasonable maintenance award is measured not by the average annual earnings over the duration of a long marriage but by the lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate enjoying if they were to stay married."). We reject these arguments for the following reasons.

¶20    We agree with Douglas that the most reasonable interpretation of the record is that the circuit court made the following determinations, and we disagree with Emily's argument that this approach would have been an erroneous exercise of discretion.   As summarized above, both sides urged the court to apply a percentage split of 55-45 to total net income, in favor of Douglas, and to impute Emily's earnings capacity as $47,000 per year.[5]   Douglas reasonably posits that, with these assumptions and the fact that the court set maintenance at $8,000 per month, the math dictates that the court implicitly found that his annual income going forward would be approximately $430,000.   This is consistent with the court's statement that his income likely falls "somewhere between" the figure proposed by Douglas ($360,000) and that proposed by Emily ($474,583).[6]

¶21    Further, we conclude that this rationale is reasonable.  Unlike in such cases as ***Bahr*** and ***LaRocque***, here we are not left with a "nagging question" about how the court properly arrived at $8,000 per month.  *See **Bahr***, 107 Wis. 2d at 82 ("We are left with a nagging question:   Why is $1,500 per month a proper maintenance award under the facts and circumstances of this case based upon these recited factors?"); ***LaRocque***, 139 Wis. 2d at 40 ("Considering both the support and fairness objectives of maintenance, we are left, to repeat what we said in ***Bahr***, with the nagging question of why $1500 and $1000 per month are proper

---

[5] At points in her briefing, Emily suggests an argument that $47,000 is not a realistic annual salary to impute to her, but she does not develop the argument or provide record support for the proposition that we should not rely on this number.  Accordingly, in our analysis we rely on the number she agreed to.

[6] Because we conclude that the most reasonable interpretation of the record is that the circuit court approximated Douglas's annual earnings going forward, until his likely retirement in his early 60s, to be approximately $430,000, this resolves Emily's concern that neither party could pursue a coherent motion to modify, terminate, or extend maintenance in the future because "the record is nebulous as to Douglas's income at the time of divorce."

maintenance awards under [the statutory factors] and the facts and circumstances of this case.").

¶22 Emily does not challenge the math behind what she calls Douglas's "reverse engineering" used to reach the income figure of $430,000. She may mean to suggest that it was an erroneous exercise of discretion, in itself, for the court to fail to explicitly estimate an income level for Douglas. We disagree. *See Finley v. Finley*, 2002 WI App 144, ¶¶19, 26, 256 Wis. 2d 508, 648 N.W.2d 536 (While a reviewing court must be able to discern the reason for the circuit court's discretionary decision, "and there must be support for that reasoning in the record," when the court does not explain its reason for a discretionary decision regarding maintenance, "we may search the record to determine whether it supports a circuit court's decision, and we do so here."). As the circuit court recognized in discussing at length factors bearing on Douglas's anticipated income, the topic of his income is relevant to multiple factors under WIS. STAT. § 767.56(1c). *See Woodard v. Woodard*, 2005 WI App 65, ¶6, 281 Wis. 2d 217, 696 N.W.2d 221 ("Our starting point is the general rule that a court should consider the parties' financial circumstances as they exist at the time the court makes or modifies a maintenance award."). And it would have provided helpful clarity if the court had explicitly estimated an income level for Douglas. But § 767.56(1c) does not require the court to make an explicit statement, so long as we can discern that the circuit court made and considered reasonable assessments of each party's income. Here, we can discern a reasonable assessment that the court applied.

¶23 Emily questions the premise that the circuit court actually applied a 55-45 split to total net income, and argues in the alternative that if the court did apply that split, she questions how an unequal division could be fair to her. We

10

conclude that the record, together with observations and findings by the court, support Douglas's interpretation of the court's approach and also support a determination by the circuit court that this amount is fair to Emily. This includes, as we now discuss, the basis for the specific income figure of approximately $430,000.[7]

¶24    The record reflects that, in real terms, Douglas earned only slightly more than $430,000 in 2018, that this is more than he had earned in any year before 2018, and that it is well in excess of what he made, in inflation-adjusted terms, in 2015 and prior years. Further, the circuit court acknowledged that Douglas had recent annual income levels in the $550,000 range, but then proceeded to discuss reasons for the court to conclude that he was unlikely to continue to earn at that level. The court credited Douglas's testimony that, as a senior partner working at what the court characterized as a "very prestigious" law firm and billing clients at relatively high rates, increasingly he must compete for business not only with lower-cost attorneys at other law firms but also with less costly, younger partners and associates within his own large law firm. The court analogized Douglas to an aging professional athlete who still has enough value to command a big paycheck but who finds it increasingly challenging to compete with more junior players. In a related vein, the court credited Douglas's testimony

---

[7] Emily hypothesizes that the circuit court might have attributed to Douglas an annual income going forward of $550,000, which she submits would have produced an unfair split of total net income equaling 63 percent to Douglas and 37 percent to Emily, given the award of $8,000 per month. But for reasons we explain in the text, we interpret the court to have relied on the 55-45 split urged by both parties, with his income at the $430,000 level.

Along related lines, Emily suggests that the circuit court may have mechanically relied on Douglas's averaging of his inflation-adjusted annual income for the years 1998-2021, which came out to about $360,000. But Emily fails to direct us to record evidence that the court based the amount of maintenance on this specific averaging figure.

that, in the words of the court, Douglas "works his tail off" in a "very stressful" job that "takes a toll on a person's health and so forth." This suggests a finding that it is likely and not unreasonable for Douglas's income to drop from his then-recent levels. Emily essentially ignores these findings in arguing that the court was obligated to view Douglas as being "at the height of his career."

¶25 We acknowledge that the circuit court's selection of approximately $430,000 was not the only reasonable choice available based on the evidence; there was evidence that could have supported a higher number. But under our standard of review, the record and the court's findings provide a sufficient basis to consider $430,000 one reasonable expectation for Douglas's annual income going forward.

¶26 Emily challenges as "entirely speculative" comments by the circuit court about possible downturns in the real estate market having negative effects on Douglas's career or earning capacity. But construing the court's comments on related topics as a whole, we interpret the court's comments about the real estate market to have been primarily an acknowledgment of the uncertainty of Douglas's professional success going forward—depending in part on factors that are out of his control—which during any given period of time could help to either reduce or increase his earning potential. The court did not, as Emily suggests, base either the amount or term of the maintenance award on a prediction that there would be a crash in the commercial real estate market that would significantly drag down Douglas's earnings.

¶27 Turning to the 55-45 split, in the circuit court Emily took the position that "[t]o adequately meet the support and fairness objectives of maintenance, Emily agrees that a division of income in which Doug receives 55%

of the net income and she receives 45% of the net income is fair." On appeal, Emily continues to contend that 55-45 is a fair split of net income, while arguing in part (as we have just discussed) that the court attributed too little net income to Douglas going forward. Emily asserts that there is not a sufficient basis in the record to support the conclusion that the circuit court actually followed a 55-45 split, but we disagree. This was the split urged by both sides. Further, for reasons we now explain, the record amply supports the conclusion that the court relied on the 55-45 split and also supports the conclusion that the court did not erroneously exercise its discretion in applying a 55-45 split based on a "reasoned decision producing a reasonable result based" on the facts of the case. *See **Bahr***, 107 Wis. 2d at 84-85 (A 50-50 split of total incomes is a "reasonable" "starting point" to determine the amount of maintenance, but "'[i]t is the equitableness of the result reached that must stand the test of fairness on review,' and such a result requires a reasoned starting point adjusted to reflect thoughtful consideration of other important factors." (quoted source omitted)).

¶28 Relevant to the circuit court's determination that the $8,000 per month level, implicitly produced by the 55-45 net income split, would meet the support and fairness objectives was a finding that Douglas would likely retire at between 60 and 63, with the result that if they had remained married, their combined income would have fallen off significantly at that point. Given that time line, the court observed, Emily has already "gained the [financial] benefit of a substantial chunk of his career path because [Douglas is] … certainly [at] the tail end of [his career] now and she's gotten the benefit of a lot of that by the division of the property." In other words, the court recognized Emily's significant contributions to Douglas's career over the course of a long-term marriage (a fact not disputed by Douglas) and concluded that those contributions had been largely

financially returned to her in the form of the property division: "She is gaining the benefit of both her toils and his toils. She toiled at home." The court observed that Emily and Douglas had not accumulated "substantial debt," but instead they had put "a lot of money … aside for retirement and so there was a nice chunk for both of them," which they divided equally. Stated in terms of *LaRocque*, Douglas did not leave the marriage with all of the "asset[s]" represented by the "stream of income which [Emily's] contributions helped [Douglas] to develop," but instead she received much of these assets in the form of the property division and the maintenance award of $96,000 per year over six years. *See LaRocque*, 139 Wis. 2d at 38.

¶29 More specifically, the circuit court estimated that Emily had approximately $1.4 or $1.5 million "in the bank right now," which with favorable investments might be expected to increase to as much as $2 million by the time she might need to start drawing on it when she is in her early 60s. "[A]ssuming another 20 years of life, she could draw $100,000 out of there a year. After tax, she'd have $80,000." The court also predicted that the maintenance award would allow Emily "to provide for herself, have a nice place to live," and that if she decided to obtain employment that pays approximately $47,000 annually, she could "put almost all of [those earnings] into a retirement account."

¶30 Emily argues that the circuit court's prediction of her potential investment returns was "artificially inflated." She contends that the court overlooked the fact that she would need to arrange for a residence and that the investment environment in coming years might be unfavorable. We are not persuaded that the court erroneously exercised its discretion based on various scenarios that the court summarized, under which Emily could support herself in a lifestyle approximating her prior and anticipated future lifestyle—including either

purchasing a residence outright or with a manageable mortgage—and that she would expect reasonable returns on investments of her sizable cash holdings. The court reasonably disclaimed an ability to see the future through a "magic crystal ball" on such issues as Douglas's earnings prospects, and Emily fails to show that the court misunderstood the general upside and downside risks of investments that Emily might decide to make.

¶31 Emily argues that the circuit court "mistakenly justified its maintenance amount in terms of its perception" that the "average" person would be satisfied with an income of $8,000 per month. This argument rests on the court's observation that "[a] lot of people would be happy to make" an annual gross income of $96,000. Emily takes this comment as an indication that the court set the maintenance amount based on the view that the average American or Wisconsinite would welcome a gross income of $8,000 per month. But the court clarified that it intended only to emphasize that $96,000 per year, tax free, represents to Emily and her ability to continue in roughly the same lifestyle "a nice amount of money, a good amount of money." We do not see a basis in the record to conclude that the court lost sight of or misapplied the rule from *LaRocque* that courts are to attempt to set maintenance in a long-term marriage case to approximate to the degree feasible the lifestyle that was enjoyed by the parties in the years immediately before the divorce and that the parties could anticipate enjoying if not for the divorce.

## II. Term of Maintenance

¶32 The monthly maintenance award set by the circuit court will expire in June 2029, when Emily is over 59 and one half years old, and when Douglas has just turned 62. Emily argues that, in rejecting her proposal of an indefinite

15

term, the court: overlooked the fact that maintenance awards may be modified under WIS. STAT. § 767.59 based on proof of substantial changes in circumstances; relied on speculation about when Douglas will retire; deprived Emily of an appropriate standard of living; relied on faulty reasoning; and departed from case law and "clear public policy promoting fairness." We conclude that Emily fails to show an erroneous exercise of discretion on this issue.

¶33    We begin by noting that, as Douglas now points out, the circuit court in its discussion at the trial may have inadvertently confused two distinct concepts: how long maintenance should be paid (which we refer to as "the duration issue") and whether Douglas should pay a fixed amount per month as opposed to a percentage of his income calculated in an ongoing manner (which we refer to as "the mode of calculation issue"). Regarding the duration issue, one approach that circuit courts may use is to establish a set number of years, and another approach is to order an indefinite award, bearing in mind that both an indefinite award and an award based on a term of years have the potential to be modified by the court in the future. *See* WIS. STAT. § 767.59; ***Hefty v. Hefty***, 172 Wis. 2d 124, 138, 493 N.W.2d 33 (1992) (stating that an award of indefinite maintenance "is not necessarily permanent" and may be adjusted as circumstances warrant). Regarding the mode of calculation issue, a court may establish a percentage of income for a maintenance award, as opposed to a fixed amount, if the payer's income fluctuates, because with a percentage award, "a subsequent increase or decrease in the payer's income results in an automatic adjustment." *See **Hefty***, 172 Wis. 2d at 132-33.

¶34    With that background, the circuit court said at the trial:

> In terms of the duration, I am going to set a fixed amount, not an indefinite amount. And the reason for that

is I think actually it benefits both parties, okay? I think it benefits [Douglas] in the sense that he's got some certainty about the duration. He can make plans.… [M]aybe he'll work until he's 70, but he pretty strongly hinted that if he can do it, he's gonna leave, … maybe not right at age 60, but, … [in his] early 60s. I didn't get the sense from him that he's planning to keep grinding it out until age 70 or something like that.

So my best estimate is somewhere between 60 and 63 or somewhere in there he's going to be making a shift; that's my best estimate. And this fixed amount will benefit him because if he does decide to keep on that track, he knows that that's in place. It benefits you too, [Emily]. I know you may be disappointed by not getting indefinite, but like I said before, giving a fixed monthly amount, he's sort of got the risk of what's going to happen, whereas, … you're going to be getting a certain amount every month. So depending on what his income—we don't know who's going to end up—ten years from now we'll know who won that quote, unquote wager, I guess, if you want to put it that way. But I do think a fixed amount is appropriate.

¶35 Considered in isolation, the circuit court's repeated used of the phrase "fixed amount" and the phrase "not getting indefinite, but … a fixed monthly amount" could be understood as a reference to the mode of calculation issue. If that were the court's intent, then it would have meant to convey that the parties would get the benefit of predictability inherent in the mode of calculation that sets a fixed dollar amount per month, as opposed to variable amounts based on a percentage applied to variable income levels. This reasoning, on its own, would not have significantly supported a ruling on the term length, because fixed monthly maintenance amounts are the most common mode of calculation.

¶36 But when interpreted in proper context, it appears that what the court meant by using the phrase "fixed amount" was to convey the idea of a "fixed term"—or put differently, a "fixed [total] amount"—and not a "fixed [monthly] amount." First, there was no mention during the trial of the possibility of a percentage-of-income mode of calculation. Second, the court contrasts "fixed

amount" with "indefinite amount," suggesting that amount means "amount of years," not "amount of payments." Third, the substance of the court's discussion just quoted for the most part appears to be aimed at the duration of term. The gist of the court's comments is that it would set a fixed term of years as requested by Douglas, and not an indefinite term as requested by Emily, to allow both sides to make concrete plans and not have to wonder whether and when there might be a motion to modify maintenance based on a purported substantial change in circumstances, whether that motion might be granted by the court, and, if granted, what any specific modification or modifications might be. *See Nichols v. Nichols*, 162 Wis. 2d 96, 103, 469 N.W.2d 619 (1991) ("maintenance is always subject to modification upon a showing of the requisite change in circumstances").

¶37 With that clarification, we conclude that the circuit court's reasoning regarding the term of maintenance payments took into account required factors and provided one reasonable means of accomplishing the fairness and support objectives. As with Emily's monthly amount arguments, she made reasonable arguments for an indefinite award. But applying the proper standard of review, we cannot say the court did not reasonably exercise its discretion in setting a fixed term of six years. We now address Emily's arguments to the contrary.

¶38 Emily contends that the circuit court's reasoning was flawed because it said that "ten years from now we'll know who won that quote, unquote wager" about Douglas's income levels and that this statement represented the court's misunderstanding about the availability of modification based on substantial changes in circumstances. While not entirely clear, this particular comment appears to have been merely an echo of the court's earlier statement that it was keenly aware that it lacked a "magic crystal ball," and that the court could not

predict precisely what Douglas might earn in future years or precisely when he would retire.

¶39 Emily suggests that this shows that the circuit court failed to consider the benefits of an indefinite term. We disagree. The court's implicit reasoning was that it would be of more value to both parties to have the certainty of $8,000 payments each month for the six years than to subject them to the uncertainty of not knowing when payments might be increased, decreased, or stopped. And, the court did not state that it operated under the (false) understanding that Emily could not move for modification in the future if there is in fact a substantial change in circumstances from those that existed at the time of the trial, including the court's determinations that Douglas's income would fall somewhat and that he would likely retire in his early 60s. Emily now asserts that a "tremendous number of events could happen in the next six years that will negatively[ ]impact her income." But in the event that significant events occur for either Emily or Douglas that represent substantial changes in relevant circumstances, she could move for modification.

¶40 Emily argues that the circuit court relied on speculation about when Douglas will retire. For this argument, she relies heavily on *Heppner v. Heppner*, 2009 WI App 90, 319 Wis. 2d 237, 768 N.W.2d 261. But as we now explain, Emily fails to take into account specific findings of the circuit court here that are readily distinguishable from significant facts in *Heppner*, and she misinterprets *Heppner*.

¶41 In *Heppner*, this court reversed a maintenance order that the husband pay the wife 50 percent of his base salary and 50 percent of his bonus payments, and that the term be for four years, or until the husband's 60th birthday,

a date apparently selected because he anticipated retiring between the ages of 55 and 60. *Id.*, ¶¶6, 11, 15. We explained that, on the facts of that case, the termination date selected by the circuit court ignored the principle that the wife was entitled, as the court stated in *Hefty*, to enjoy "'the lifestyle that the parties could **anticipate** enjoying if they stayed married.'" *Heppner*, 319 Wis. 2d 237, ¶¶14-15 (quoting *Hefty*, 172 Wis. 2d at 134) (bolding in *Heppner* and *Hefty*).

¶42 There are similarities between this case and *Heppner* but also significant differences. Both cases involved long-term marriages, with the husband being a high income earner and the wife taking care of the home. *See Heppner*, 319 Wis. 2d 237, ¶¶1, 2, 5. However, in *Heppner*, the wife had significant health issues and her future earnings prospects were quite limited, in contrast to the $47,000 annual earnings imputed to Emily here. *See id.*, ¶¶2, 13. In addition, the husband in *Heppner* made over $800,000 the year before the divorce and over $1,500,000 the year before that (in 2006 dollars), which is several fold more than Douglas's recent earnings. *See id.*, ¶5. Significant to the *Heppner* court was an error by the circuit court. The error was to accept, without a basis in the record, the husband's assertion that he would have no sources of income after his retirement from his position as the chief executive of a division of a conglomerate with $8 billion in total sales. *Id.*, ¶4, 14-15. Here, the circuit court had a reasonable evidentiary basis to conclude that Douglas would have at best only a relatively modest income not derived from his savings after his anticipated retirement.

¶43 Another important distinction is that there is no discussion in *Heppner* of a factor that the circuit court here considered highly significant: the degree to which the spouse with the lower earning potential has already secured many of the financial benefits of supporting the higher-earning spouse's career

during the marriage through the division of the marital estate. That is, the court in *Heppner* did not consider facts of the type presented to the circuit court here that involved Emily's enjoyment of an equal division of a significant, well-funded investment plan that the couple had accumulated during the marriage.[8]

¶44 Emily misinterprets *Heppner* to stand for the proposition that a circuit court errs whenever it considers, as part of its determination of a term of maintenance, an anticipated retirement date of the payer. We have just summarized the problems with the circuit court's approach to the retirement topic in *Heppner*, and the court of appeals in *Heppner* did not exclude the estimated retirement date of the payer as a valid consideration in the determination of a fixed-term maintenance order.

¶45 To the extent that Emily intends to argue that the circuit court here lacked an evidentiary basis to make a finding that Douglas would likely retire in his early 60s, she fails to support such an argument. She asserts that the prediction is "unsubstantiated," but she does not explain why the court could not credit Douglas's testimony on this topic. She also fails to support a related contention that is merely suggested in her briefing. This would be an argument that the court was obligated to find, based on the evidence in the record, and then incorporate

---

[8] Emily asserts that there was no evidence that Emily and Douglas, while married, accumulated "extraordinary savings" compared to that typically accumulated by other "high-income professionals." But it was not necessary for the circuit court to find their savings to have been relatively "extraordinary" in order to find that the savings that Emily could rely on going forward were substantial, including the absence of substantial debt. We add the general observation that substantial credit card debt, loans on vehicles and boats, and first and subsequent mortgages on real estate are not uncommon features of household finances even at higher income levels. What matters here, however, is not what is average or typical. What matters is that the circuit court explicitly credited the couple here with a high rate of savings during the course of the marriage that was divided equally in the property division, giving Emily much of the benefit of her substantial contributions to Douglas's ability to generate his income.

into its analysis, that Emily had a reasonable expectation that Douglas would continue to work as a highly paid corporate attorney until he is about 70 or older.

¶46    It should be clear from our discussion to this point why we reject Emily's argument that the term of six years deprived Emily of an appropriate standard of living.  In sum, the circuit court, in a reasonable exercise of its discretion, determined that she would have a standard of living that approximates her lifestyle during marriage and what she could anticipate enjoying into the future based on the six years of maintenance at $8,000 per month, her savings and ability to earn investment income from her savings, and her ability to earn money at a job paying $47,000 annually.  For example, the court provided a reasoned explanation of its view that the $8,000 monthly payments were sufficient to meet the monthly budget that Emily submitted to the court, and that she could productively invest any additional income that she made by getting a job over the course of the six years.

¶47    Emily asserts that the court failed to support the selection of six years as the term, in particular "how or why six years is enough time for her to reintegrate into the workforce."  Emily does not develop this argument, for example, by suggesting what number of years the court should have selected and why that number would be sufficient if six is too short.  Further, Emily has known since at least February 2022 that Douglas was seeking a divorce.  We also note that she has the benefit of the full $8,000 per month in tax-free payments throughout the six-year term, without a step down at any time.

¶48    Emily contends that the circuit court improperly relied on the consideration that Emily would be older than 59 and one half when maintenance ends under the challenged judgment and that this would allow her to make

22

withdrawals from her retirement assets without penalties if she decided to make withdrawals. Emily argues that this "require[s]" her to draw down her property division to meet living expenses, which is improper because Douglas is not so required. But the circuit court did not require her to make such withdrawals. The court merely observed that, depending on how Emily decides to handle her affairs going forward—her possible purchase of real estate of various potential values, possible employment at various levels of compensation, possible investing strategies—one option in the overall mix would be for her to consider making these penalty-free withdrawals to support her lifestyle. Emily also points out that, while the withdrawals would be penalty-free, they would not be tax-free. But she fails to identify an erroneous exercise of discretion by the court based on that distinction. The court did not suggest that it operated under the mistaken belief that retirement account withdrawals would be tax free. It merely noted this positive aspect of one financial option available to Emily after the maintenance payments end after six years, assuming that there have been no modifications to maintenance.

¶49    As with the amount of the award, on the duration issue, Emily in effect asks us to view the evidence differently than the circuit court viewed it, with an emphasis on evidence that best supports her position. But a circuit court "in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach[.]" *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).

¶50    Summing up on both issues, we conclude that the circuit court did not erroneously exercise its discretion in applying the statutory factors to achieve both objectives of maintenance: support for Emily in accordance with the needs and earning capacities of the parties; and a fair and equitable financial

23

arrangement between the parties based on the specific evidence presented at trial. *See* **Forester v. Forester**, 174 Wis. 2d 78, 84-85, 496 N.W.2d 771 (Ct. App. 1993); **King v. King**, 224 Wis. 2d 235, 249, 590 N.W.2d 480 (1999).

## CONCLUSION

¶51    For all these reasons, we affirm the judgment of divorce, including the amount and term of maintenance.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.